Athanasius Y. SAMUEL, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 5946.

United States Court of Appeals First Circuit.

June 21, 1962.

George B. Lourie, Boston, Mass., Arnold R. Cutler and Daniel D. Levenson, Boston, Mass., on the brief, for petitioner.

David O. Walter, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and L. W. Post, Attys., Dept. of Justice, on the brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a decision of the Tax Court of the United States which sustained the determination of the Commissioner of Internal Revenue that there existed a deficiency of $60,-813.33 in petitioner's income tax for the taxable year 1954.

Petitioner, Archbishop Athanasius Y. Samuel, is the head of the Syrian Church of Antioch for the United States and Canada. Before assuming his present position in the United States he served in the Middle East. While in that area he received word that certain native Bedouin tribesmen had discovered documents which have come to be known as the "Dead Sea Scrolls." Thereafter, the Archbishop purchased a number of these scrolls. In 1949 he brought these scrolls to the United States and placed them on display in various parts of the country as documents of conspicuous archaeological and religious significance.

On November 30, 1951 the Archbishop, as settlor, transferred the scrolls to a trust denominated the Archbishop Samuel Trust, with its office at Worcester, Massachusetts. The Archbishop and a Charles Manoog, of Worcester, were named as the two trustees. This trust provided, *inter alia*, that all of the net income and 90% of the principal should be disposed of at the Archbishop's direction. In addition, the Archbishop retained full power in himself to amend and revoke the trust. Under the terms of the trust agreement, on the death of the Archbishop, the trustees were directed to pay his mother, during her lifetime, such sum of money as in their uncontrolled discretion would be sufficient

to support her in the style to which she was then accustomed but not to exceed $2500 a year.

The trust instrument gave broad powers to the trustees to deal with the corpus—at that time consisting solely of the scrolls. The trustees could either retain the scrolls or sell them. They were granted the power to buy, hold, sell, exchange, and lease all types of real and personal property, and to allocate to income and capital all trust receipts and trust expenditures.

On October 7, 1952 the trust was amended. The amendment provided in pertinent part:

"Second: During the Settlor's lifetime, the sum of Fifteen Thousand (15,000) Dollars to reimburse the Settlor for the cost to him of said Scrolls and an additional Fifteen Thousand (15,000) Dollars for his expected future expenses in connection therewith shall be paid to the Settlor as he directs in writing from time to time. In addition, the sum of Ten Thousand (10,000) Dollars each year, payable from income or principal, as determined by the trustees, shall be paid to the Settlor each year. Upon the death of the Settlor, the trustees shall pay to the Settlor's mother, Khatoun Malkey Samuel, of Homs, Syria, during her lifetime, such sum of money, monthly if possible, as in their uncontrolled discretion shall be sufficient for her care, maintenance and support in the style she is now accustomed to, but not more than Twenty-five Hundred (2500) Dollars a year, such sum to be paid out of income, if there is income, otherwise out of principal if at the time principal consists of something other than the Dead Sea Scrolls."

After providing for the above payments, the balance of the trust fund was to be used for charitable purposes in furtherance of the Syrian Orthodox faith.

Finally, under the amendment, the Archbishop reserved the right to reduce the amount of both his own and his mother's yearly payments from the trust. With this exception the trust was no longer to be amendable or revocable.

On July 1, 1954 the Dead Sea Scrolls were sold by the trust for a gross sales price of $250,000. The proceeds of this sale were mainly invested in stocks, bonds, and treasury notes.

The trust made no distribution to the Archbishop in 1951, 1952 or 1953. In 1954 the Archbishop did not receive the $10,000 annual payment from the trust but did receive two $15,000 payments in alleged reimbursement for his expenses in connection with the scrolls. In 1955 and 1956 the trust made payments of $10,000 to the Archbishop out of income or principal.

The trust had no income for the years 1951, 1952, 1953 and the first half of 1954 prior to the sale of the scrolls on July 1, 1954. On the fiduciary income tax return for 1954, the trust reported income of $3,794.37 and various expenses aggregating $1,043.10. On its fiduciary income tax return for 1955 the trust reported income of $8,541.75 and various expenses totalling $145.95. For 1956 the trust reported income of $10,-315.32 and various expenses totalling $1,269.50.

At all pertinent times the Archbishop and Charles Manoog were the only trustees of the trust. Manoog had no personal or financial interest in the trust.

Based on the foregoing facts, the Commissioner made inconsistent determinations of deficiency, increasing the income of both the trust and of the Archbishop in the year 1954 by $123,652.25 as capital gain from the sale of the scrolls. The Tax Court sustained the Commissioner's determination that all of the income of the trust in 1954 should be taxable to the Archbishop.

In concluding that the gain on the sale of the scrolls by the trust should be taxed to the Archbishop, the Tax Court found that the Samuel Trust fell within the purview of Section 677(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 677(a). Section 677(a), the pertinent provisions of which are set out

in the margin,[1] is aimed at the so-called "grantor trust." It provides, *inter alia*, for taxation to the grantor where the income is or may be either currently distributed to him, or accumulated for his future benefit. Where these circumstances are present the grantor is taxed if the power to control the income's disposition resides in the grantor, in a nonadverse party, or in both, provided that the approval of an adverse party is not required. The term "adverse party" is defined in Section 672[2] of the Code, 26 U.S.C.A. § 672 and means essentially a person who has an economic interest in the trust which could be affected by the actions of the grantor. In sum, under Section 677(a) (and its companion sections in the Code) " * * * the income, which prior to the creation of the trust was taxable to the grantor because he was the owner of the property which produced it, is regarded as still being within his taxable orbit despite his placing the property in a trust." Surrey and Warren, Federal Income Taxation, Cases and Materials (1960 edition), p. 1006.

Petitioner disputes the Tax Court's application of Section 677(a) to the Samuel Trust. He tacitly admits that a literal reading of Section 677(a) might fairly embrace the instant arrangements.[3] However, petitioner contends that the formation of the Samuel Trust in 1951, the transfer of the scrolls to the trust, and the 1952 amendment, under which annual payments of $10,000 were to be made to the Archbishop for his life

and, in a lesser amount for his mother's life, if she survived him, should be characterized as a *sale* of the scrolls by the Archbishop to the trust in return for an annuity. In fine, petitioner contends that the arrangements between the Archbishop and the Samuel Trust establish a creditor-debtor relationship and not a trust-beneficiary relationship. He argues that the provision for the $10,000 annual payments should be construed as a contractual obligation rather than an obligation flowing from a trust-beneficiary relationship and, consequently, that Section 677(a) should have no application to the instant arrangements.

Trust or annuity, that is the question.

■ There can be no question that, so far as the formalities of documentation are concerned, the instrument dated November 30, 1951 obviously purports to create a trust. Under its terms the scrolls were transferred by the Archbishop, styled the "settlor," to the settlor and Charles Manoog, referred to in the instrument as the "trustees." Further, the "trustees" agreed to hold the scrolls and all additions thereto "in trust." Under this agreement, the settlor reserved the right to dispose of all the trust income and 90 percent of the principal. Moreover, under the 1952 amendment, this terminology was carried through with the provisions for the fixed payments of $30,000 and the annual payments of $10,000 "payable from income or principal, as determined by the trustees, * * * to the Settlor each

---

1. § 677. *Income for benefit of grantor*
   "(a) *General rule.*—The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be—
   "(1) distributed to the grantor;
   "(2) held or accumulated for future distribution to the grantor; or
   "(3) applied to the payment of premiums on policies of insurance on the life of the grantor (except policies of insurance irrevocably payable for a purpose specified in section 170(c) (relating to definition of charitable contributions))."

2. § 672. *Definitions and rules*
   "(a) *Adverse party.*—For purposes of this subpart, the term 'adverse party' means any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust. A person having a general power of appointment over the trust property shall be deemed to have a beneficial interest in the trust."

3. In his brief petitioner states that "because Section 677(a) would apply to a particular fact situation does not mean that those facts command the finding that there is a 'settlor trust'. * * *"

year." Thus, again, considered within its four corners, the original instrument as well as its amendment spoke in terms of a trust arrangement.

Having established the surface presence of a trust arrangement, we have no hesitancy in agreeing with the Tax Court that it falls within the literal language of Section 677(a) as a "grantor trust." Initially we note that it was found by the Tax Court, is supported by the record and is undisputed by the petititioner that Charles Manoog was not an "adverse party" within the meaning of Section 672(a).[4]

██ Under Section 677 it is enough if the income of the trust "may" be held or accumulated for future distribution to the grantor. Helvering v. Evans, 126 F.2d 270, 272–273 (3 Cir. 1942); Greenough v. Commissioner of Internal Revenue, 74 F.2d 25, 27 (1 Cir. 1934). In the instant case, after analyzing the economic realities of the present arrangements, the Tax Court concluded, in language with which we agree, that the gain on the proceeds "is" so held:

> "We feel that all of the gain on the sale of the scrolls is being accumulated for future distribution to the grantor. The trust received $250,000 upon the sale of the scrolls. This amount less the expenses of the sale constituted the corpus of the trust. By the amended trust indenture Samuel was to and, in fact, did receive $30,000 of this amount as reimbursement for expenses. With the remaining corpus the trust had to meet its $10,000 annual obligation to Samuel. The cost of a fixed dollar

annuity in 1954 for a male age 47 of $10,000 per year for life, according to the rates of the Massachusetts Mutual Life Insurance Company would have been $202,174 and with a lesser annuity reserved to a woman age 65, approximately $206,000. Generally, this means, assuming a normal life span for Samuel, that it would take $202,174 together with some income therefrom to meet an obligation such as was incurred by the trust. The annuity rates used by the Massachusetts Mutual Life Insurance Company in 1954 were based on a life expectancy of a male age 47 of 28.78 years. Obviously the life expectancy at which costs of annuities are computed are the average. Nevertheless, considered on this basis the entire capital gain of the trust could be considered to be accumulated for future distribution to Samuel. But more important is the fact that there is no guarantee that the trust will produce income in any amount in any year. Broad powers of investment or reinvestment of the trust funds in incorporated or unincorporated enterprises (even though, absent the authority given by the instrument, such investments would be of a character not approved for trust funds) are given to the trustees. The trustees are Samuel, himself, and a nonadverse party. Should the investments of the trust funds be such as to produce little income, the entire amount received for the scrolls could be paid out to Samuel within a period of less than 22 years. Fur-

4. On cross-examination below, Charles Manoog testified as follows:

"XQ. Mr. Manoog, you have just testified that various expenses have been paid by the Trust during the years 1954 to 1958 were authorized to be paid; who did the authorizing, was it the Archbishop? A. Both of us. We have a meeting and decide.

"XQ. Well, were you and the Archbishop the only trustees? A. Yes, sir.

"Q. Did you personally have any financial interest in the Trust at any time?

A. No. The Trust has loaned me money and it has been repaid.

"XQ. You have no personal interest in the Trust, is that right? A. No, sir.

* * * * * * *

"XQ. If the Trust's investments failed, the Trust went broke through no fault of your own, do you consider you are under any personal liability to make these annual $10,000 a year payments out of your own funds? A. No, sir. Not according to the Trust. * * *"

thermore, all the $10,000 payments out of the trust could be made exclusively from the principal of the trust notwithstanding the fact that the trust had substantial income. Considering all these factors we think it clear that the proceeds from the sale of the scrolls were held in their entirety for future distribution to Samuel."

The petitioner while not directly challenging the foregoing analysis of the Tax Court—which is clearly unassailable—would have us overlook the fact that a trust was created. In contending for the annuity view, petitioner argues that he sold the scrolls to another party, which, irrelevantly, happened to be a trust. And, under petitioner's approach, we should ignore the fact that this other party is a trust. On the present record we do not believe that the instant arrangements are clothed with sufficient indicia of an annuity contract to overcome the Tax Court's conclusion that the petitioner was amenable to taxation under Section 677(a) as the grantor of a grantor trust.

■ As a starting point it is, of course, obvious that the Samuel Trust was not an entity regularly engaged in the business of writing annuities. Moreover, a review of the amended trust agreement discloses no *haec verba* reference to the fact that the $10,000 annual payments reserved to the Archbishop as "settlor" were to be regarded as "annuity" payments. These factors are, of themselves, in no wise fatal to petitioner's position. However, as here, where the asserted annuity has not been purchased from (and has not the financial backing) of a commercial company which regularly deals in annuity contracts, "the instruments evidencing the agreement ought to spell out in detail the intent of the parties that there is contemplated an annuity venture." Galvin, Income Tax Consequences Of Agreements Involving Noncommercial Annuities, 29 Texas L.Rev. 469, 508 (1951). This comment is particularly relevant where, as here, the intra-mural transfer at issue is conspicuously garbed in all of the external manifestations of a trust arrangement.

Inherent in the concept of an annuity is a transfer of cash or property from one party to another in return for a promise to pay a specific periodic sum for a stipulated time interval. As such, an annuity contract gives rise to a debtor-creditor relationship between the transferee and transferor. Applying the annuity concept to the instant arrangements presents several anomalies. Under petitioner's contentions, as annuitant or transferor, he would become the creditor of himself as trustee and transferee. To be sure there exists the Samuel Trust as an entity, but it must be remembered that any order directing the debtor-transferee to pay the petitioner as creditor, would be directed to the trustees, and not to the abstract trust entity.

Again, in the normal annuity situation, once the annuitant has transferred the cash or property to the obligor and has received his contractual right to periodic payments, he is unconcerned with the ultimate disposition of the property transferred once it is in the obligor's hands. However, here, the petitioner as beneficiary would have the right to compel the trustees—once again himself included—to abide by whatever limitations were established to guide the distribution of the proceeds of the sale of the scrolls.

In his brief petitioner concedes that "An annuitant would not be able to dictate to the insurance company the way it could invest his money or the proceeds of the transferred property." However, here, the petitioner—the asserted annuitant—in his capacity as co-trustee, provided for effective control of the property including the right to retain the scrolls indefinitely. Had the scrolls been thus retained, disbursement by the trust of the $10,000 annual payments would have been rendered impossible—payments which petitioner now asserts were intended as specific and fixed contractual obligations.

Moreover, as seen above, under the terms of the amended trust arrangement, the petitioner was entitled to $10,000 payments in 1952 and 1953 which he did not receive. Inasmuch as the trust had no income in these years the reason for the absence of payments is obvious. However, once the scrolls were sold in 1954, the trust did not pay nor did the petitioner apparently request the back payments which presumably had accrued to him contractually under the terms of the amended agreement. Once again, there is no question that as the settlor of a trust the petitioner would assuredly have the right to waive these payments. However, it is this very act (of waiver) which heightens the concept of trust and derogates the concept of a valid subsisting contractual arrangement. In short, the waiver more closely accords with the interpretation that the petitioner viewed himself more as the owner of the property than as the creditor of the owner.

Moreover, in addition to the reservation of the $10,000 annual payments to the petitioner the trust also provided for payment to petitioner's mother on his death, "such sum of money, monthly if possible, as in their uncontrolled discretion shall be sufficient for her care, maintenance and support in the style she is now accustomed." Such a provision is again inconsistent with the usual concept of an annuity as being an obligation to pay a fixed and definitely ascertainable amount. Further, the petitioner expressly reserved the right "to reduce the amount of income or principal to which he *or his said mother* has become entitled. (emphasis supplied).

As a matter of fact, in the years subsequent to that involved in this proceeding, the petitioner exercised this right and completely eliminated the obligation of the trustees to make further payment to himself or his mother. There is no question that, under the terms of the trust agreement, petitioner could thus dispose of his own right as well as that of his mother. However, once again, this action is, at the least, inconsistent with the act of the normal annuitant who in 1952 intended to enter a binding and enforceable contract for a series of periodic annual payments.

While, as petitioner contends, it may be legally permissible for a settlor to be the creditor of a trust, here there was, in effect, but a single transaction. In short, the transfer, which petitioner contends established him as a creditor of the trust, was the very foundation of the trust itself. The transfer which the petitioner views as a sale to the trust was, in reality, the same transfer which created the trust.

Courts have not been hesitant to look through the formalities of a transaction and, where warranted, attribute to a grantor the tax consequences of a reserved enjoyment of income. In Estate of Cornelia B. Schwartz, 9 T.C. 229 (1947), the decedent had transferred property to her children purportedly in exchange for the promise that the children would pay her an annuity for life. The children immediately transferred the property to a trust, under the terms of which the trustee was to make payments to the mother. The court concluded that the facts did not warrant the determination that an annuity had been created, and held the property includible in the mother's estate on the reasoning that she had, in effect, retained the possession and enjoyment via the invocation of the trust as a security device. Thus, the court stated:

"It is petitioner's contention that decedent should not be regarded as the grantor of the trust of June 4, 1932; that the transfer of the securities on that date from decedent to her three children should be treated as a purchase by her from them of an annuity of $7,000; and that the creation of the trust on the same date by the three children in their mother's favor should be treated as an entirely separate transaction and one which was made for the protection of the children, to secure the payments of the annuity, without having to fall back on the children for its payment. If we should sus-

tain petitioner's contention that the two transactions should be considered separate and apart from each other it would naturally follow that we would hold, in petitioner's favor, that decedent was not the settlor of the trust. However, we do not think the facts would warrant us in treating these two transactions separately, but that they must be considered as parts of the same transaction, and, when this is done, we think we must hold that decedent was the real settlor of the trust of June 4, 1932, for it was she who on the very day that it was created furnished the securities which comprised the corpus of the trust, and before the transactions were concluded she was to receive its entire income, annually and payable quarterly, up to $7,000 in any one year." Id. at 238–239.

Petitioner relies principally upon Becklenberg's Estate v. C. I. R., 273 F.2d 297 (7 Cir. 1959). In that case the decedent and other members of her family transferred property to a trust. The decedent's contribution totalled 26.78 percent of the corpus of the trust. Under the terms of the trust, decedent was to receive $10,000 a year out of trust income. The 26.78 percent of the property of the trust could clearly produce more than the $10,000 a year payments. The court held that the decedent had been entitled to receive the $10,000 per year whether there was sufficient income to pay it or not, and since she did receive this amount "there was nothing left to be included in her gross estate."

However, in construing the trust the court there expressly noted that "we believe that the Trust had an obligation to pay decedent $10,000 annually, and *that her right to receive it was not limited to the property transferred by her or the income therefrom.*" Id. at 301 (emphasis supplied)

In the instant case the only source of payment to the petitioner was the property transferred by the petitioner and the income from it. This apart, the Samuel Trust, as an entity, was impecunious. Moreover, in Becklenberg's Estate, the express purpose for creating the trust was specifically the liquidation of the transferred property as expeditiously as possible so that commercial annuities might be purchased, including annuities for the decedent in the amount of $10,000 per year. Although the purchase of these annuities was not actually effectuated prior to decedent's death, the annual payments were regarded as a temporary substitute. Moreover, in Becklenberg's Estate, the decedent was not a trustee and had no power of management over the trust. She did not retain any effective control over the property in contrast to the petitioner here. Finally, in that case, the decedent had in fact made claims against the trust for deficiencies in back payments. Here the taxpayer—when similarly situated, made no such claims. In short, the presence of an arm's length debtor-creditor relationship was more sharply drawn in Becklenberg than is the case here and, consequently, we feel that the petitioner seeks to derive too much comfort from the result in that case.

As an alternative argument, petitioner contends that if, as we have decided, the amended trust agreement created a grantor trust and not an agreement for the purchase of an annuity, the basis of the scrolls should be increased by certain expenditures of the trust, thereby reducing the amount of the gain. We believe that the Tax Court's disposition of these items was correct. Treas.Reg. § 1.671–3 (1954 Code); Welch v. Bradley, 130 F.2d 109, 143 A.L.R. 1108 (1 Cir. 1942).

A judgment will be entered affirming the decision of the Tax Court.

ALDRICH, Circuit Judge (concurring in result).

I would prefer not to discuss the extent to which the payments to the petitioner might or might not technically be considered an annuity as I do not think on the fiscal facts of this case the plain words of the statute are to be so circumvented.