**Floyd G. PAXTON and Grace D. Paxton, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 72–2408.

United States Court of Appeals, Ninth Circuit.

July 8, 1975.

Certiorari Denied Dec. 8, 1975. See 96 S.Ct. 450.

---

**924**

Peter M. Lind (argued), Bellevue, Wash., for petitioners.

Scott P. Crampton, Asst. Atty. Gen. (argued), Tax Div., Dept. of Justice, Washington, D. C., for respondent.

## OPINION

Before CHOY and GOODWIN, Circuit Judges, and BURNS,* District Judge.

BURNS, District Judge.

The Paxtons appeal a decision of the Tax Court, 57 T.C. 627, upholding the Commissioner's determination that they were taxable on part of the income of a trust they had established because it was a grantor trust as defined in §§ 671–677 of the Internal Revenue Code. Jurisdiction of this appeal is given by 26 U.S.C. § 7482. We affirm.

All relevant facts were stipulated to the Tax Court. On August 3, 1967, Floyd G. Paxton created the F. G. Paxton Family Organization (the trust); he and his wife Grace transferred to it their entire interest in the Kwik-Lok Corporation (Yakima), a manufacturing firm of which they owned 86.38%, as well as a small assortment of other assets including their home. In return, they received Certificates of Interest for 4319, or 86.38%, of the 5000 Units of Interest in the trust. Two sons, together with their wives, and the plant manager of a controlled subsidiary also contributed Kwik-Lok stock to the trust, and received certificates for the remaining 681 units. Son Jerre Paxton received 192 units or 3.84%. By September 30, 1967, the trust owned all Kwik-Lok's stock and had issued all the Certificates of Interest.

The trustees initially appointed were Lorne House, an employee of Kwik-Lok, and Jerre Paxton. Three more were named October 9, 1967: Irwin, Tait, and Loudon. In September, 1969, the latter two were replaced by Shrader and Glaspey, and in November, 1969, Glaspey resigned without replacement. None other than Jerre Paxton owned units of the trust; none other than Paxton and House had any relationship to the taxpayers or to the corporation. Although Article VIII provides for majority decision, the trustees voted at their first and

---

* Honorable James M. Burns, United States District Court for the District of Oregon, sitting by designation.

several subsequent meetings to name Jerre Paxton as First Trustee, giving him broad management authority and a veto power over all trust actions.[1]

The trust is to last for twenty years, but Article IX permits the trustees "at their discretion . . . [to] distribute and close the Trust at any earlier date determined by them. The Trust shall be proportionately and in a pro rata manner distributed to the beneficiaries."

In addition, Article V provides that "the Trustees may, in their sole discretion, at any time and from time to time, make any distribution of income from the operation of the Trust estate and make any distribution of all or any portion of the assets comprising the Trust estate for any reason to the Holders of Certificates of Interest in the trust."

At issue in this case is whether the powers of the trustees, which concededly amount to a power to revoke (§ 676) and a power to distribute income (§ 677), are held by non-adverse parties. The Courts of Appeals have jurisdiction to review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a). Findings of fact will not be set aside unless clearly erroneous. *Estate of Meyer v. C. I. R.,* 503 F.2d 556 (9th Cir. 1974). The same rule applies to factual inferences from undisputed facts. *Nor-Cal Adjusters v. C. I. R.,* 503 F.2d 359 (9th Cir. 1974). Whether the economic arrangements of the trust cause the interest of a trustee to be adverse to that of a grantor is a factual question, as the Tax Court properly concluded. Even if adversity were viewed as a mixed issue of law and fact, however, it is so closely tied to a relatively non-technical standard, so dependent upon assessment of the practical consequences of trustee actions, that primary weight should be given to the fact-finder's re-

sults. Our task on appeal, then, is to determine whether the Tax Court's finding of non-adversity is clearly erroneous.

An adverse party, to whom the grantor must give effective control of the trust if he is to escape taxation on its income, is defined as "any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust." Int.Rev.Code, § 672(a).

Of the trustees named, only two were asserted to have any interest whatsoever in the trust. The taxpayers complain that the Tax Court "ignored the existence of the . . . additional Trustees" and, therefore, erred in finding that "the trustees are nonadverse parties." As taxpayers themselves point out, "no evidence or argument of any kind was ever presented to the Court below" concerning other trustees. Recognizing that the burden of proof lies upon the taxpayers, we cannot supply their evidence for them, but we may note that the record shows that none of the Units of Interest could be held by any additional trustees who may have served. The Units are all accounted for. Whether the trustees have a power of appointment will be discussed below with reference to Lorne House.

Who among the trustees had what powers when is not altogether clear, and is not made so by the parties' briefs, which drift from one assumption to another. Jerre Paxton's veto might make his adversity dispositive: if no revocation or distribution is possible without his approval, and if he is adverse, then the Paxtons are not taxable. The veto power, however, is not prescribed by the trust itself and can be withdrawn by a majority of the trustees. In turn, how many are needed for a majority can change if the trustees increase or decrease their number, as Article VIII al-

---

1. Taxpayers assert in their brief that the trustees had voted to give Jerre Paxton a power "merely negative in nature." Before the Tax Court, however, they said he "is in essence the sole trustee," suggesting affirmative powers as well. Both characterizations appear in the Board of Trustees minutes.

lows and as the trustees have, in fact, done.

Ten days after the trust had taken in its main assets and given out its certificates, the two initial trustees added three more. The number stayed at five for two years, then dropped to four. Thus it might be said that, for all times except the first ten days, the interests of trustees other than Jerre Paxton are dispositive since the others were always a majority.[2] Because the exact arrangement of power is so unclear, we will discuss the adversity of Jerre Paxton, of the trustees collectively, and of House.

Jerre Paxton holds 3.84% of the Units of Interest. These units are not rights to present benefit, which is entirely within the trustees' discretion, but to a share of the assets at termination. The adversity of Jerre Paxton's interest depends upon whether and how his 3.84% share would be affected by exercise of the powers to revoke or to distribute income and assets.

A change in the share's size is one possibility, the only one discussed by taxpayers, the Commissioner, and the Tax Court. The Court found that he would receive 3.84% of the assets, the share with which he began, at whatever time the trust was terminated. Taxpayers contend that it was to Jerre's advantage to resist distribution of assets until after the death of, at least, his parents because their interest would be nullified at death, giving the survivors larger shares.[3] The Certificates of Interest say

"At the death of the holder hereof this Certificate is null, void and of no force and effect, and no heirs or legal representatives of any deceased holder hereof shall have any right to any property of the Trust or to demand any parti-

tion or division of the property of the Trust or to any special accounting." When read with Article V of the trust, which speaks of heirs and bars dissolution of the trust upon transfer of certificates by devise or descent, this legend appears part of quite common arrangements to perpetuate the trust beyond the lives of the first interest-holders.

The second half of the sentence prevents a division of the trust property. The "null, void" language is intended to put a stop to negotiability of the interest by means of the certificates at the time of death, so as to protect the equitable interest of the deceased holder. The certificate becomes void, not the underlying interest. That death should not precipitate distribution is plausible enough, that the chance order of death should determine who gets how much is far less plausible.

Nothing in the trust document itself says anything about the "last survivor take all" arrangement. It is only specified that "said Certificates of Interest [be] substantially in form hereto attached as Annex I." The language upon which taxpayers rely is therefore not even obligatory upon the trustees who are to issue the certificates, short of decision in a construction suit. We may note also that both Article Fourth of the trust and the first paragraph of the Certificate form speak of the certificate and the equitable interest represented thereby as distinct entities. Taxpayers' interpretation of the "null, void" language would require that we consider the certificate and the interest merged.

■ For these reasons, we are unable to conclude that the arrangement taxpayers created is the "last man" trust they describe. Even if Jerre's share will

---

**2.** Another possibility is that Jerre held not only veto but also active power. See note 1.

**3.** Calculating in accordance with taxpayers' contention, we find that on the death of his father and mother, Jerre Paxton's 3.84% interest would jump to 28.19%. If he survived his wife, his brother, his sister-in-law, the plant manager Phil Crawford, and Crawford's wife

Wanda, then his interest would be 100%. Similarly, if all the Paxton family should die before the Crawfords, the Crawfords' initial 0.76% interest would leap to 100%. At oral argument, when taxpayers' counsel was asked what would follow if *all* the interest-holders should die, he replied that the trust might escheat.

not change in size, it may change in value and so make him adverse. Giving away the apples will obviously leave a leaner pie to slice. But an accurate measure of malnourishment must account for the size of the pie. The tests of substantiality and adversity must be linked if we are to recognize the statute's purpose of taxing the income from property over which real control has not been relinquished. Under the earlier Revenue Acts, 45 Stat. 840, the income of a trust was taxable to the grantor if he had the described powers "either alone or in conjunction with any person not a beneficiary."

> In an attempt to avoid this section, the practice has been adopted by some grantors of reserving power . . .
> in conjunction with a beneficiary having a very minor interest . . . in such cases the grantor has substantially the same control as if he alone had power to revoke the trust. Sen.Rep. No. 655, 72d Cong., 1st Sess., p. 34.

The Senate Finance Committee's recommendation to substitute "substantial adverse interest," based upon this perceived possibility of avoidance, was enacted in 1932, 47 Stat. 221, and has been carried forward to the present §§ 671–677.

■ For a sole remainderman, each dollar of trust corpus revested in the grantor costs a dollar. His adversity is as strong as the grantor's advantage, so that we may fairly say his decision is beyond the grantor's control. The statute's presumption that a trustee with discretion will be amenable to the grantor's wishes has been overcome. From this paradigm of adversity we slide, how-

ever, to Jerre Paxton's 3.84%. Each dollar given away costs him less than four cents.[4] So slim a restraint upon the power to distribute income and assets of the trust to the Paxtons is not sufficient to protect them from all tax whatsoever. Jerre Paxton is adverse not as to the entire trust but only as to his share. Treas.Reg. § 1, 672(a)–1(b). Without setting out a formula for acceptable percentages, we can affirm as not clearly erroneous the Tax Court's finding that Jerre Paxton is not an adverse party.

■ As to the interest of Lorne House, taxpayers make two arguments based on the terms of the trust.[5] In the Second Preamble, Paxton indicated three ranked purposes for the trust: to manage the corporation, to make educational, scientific, or religious grants, and to make distributions to the interest-holders. Because the trustees may, in pursuit of their first two goals, distribute the assets of the trust to any person whatsoever, the trustees collectively and Lorne House with them are claimed to have a general power of appointment, which the Code specifically declares a beneficial interest. Int.Rev.Code, § 672(a). It is not clear that the trustees could use assets rather than income for the second purpose, but even assuming they could, taxpayer's argument is still unsound. Constrained by standards of this sort, the trustees have not a general power of appointment but, at most, a special power. In Washington, whose law governs this trust,

> a power of appointment is general if it is capable of being exercised by the donee in favor of anyone including

4. This calculation assumes assets are distributed under the Article V power. If the Article IX power to terminate were exercised, Jerre Paxton—also a contributor to the trust—would get back what he put in, with marginal adjustment for differences among the contributors in the ratio of Kwik-Lok shares to Units of Interest.

5. In the briefs and at argument, we have been urged to recognize that the F. G. Paxton Family Organization is unique, unusual, and unconventional in its structure as well as its opera-

tion. Certainly it is unusual to find a trust instrument title "Declaration of Trust of This Constitutional Trust." We may agree that this and other aspects of the trust are novel, devised for the sound and praiseworthy purpose of preserving the business Floyd Paxton created with his inventiveness and his hard work, but we must in these circumstances focus on the powers the trustees plainly had, not motive or intention or the way the trustees chose to exercise their powers. See, *Samuel v. C. I. R.*, 306 F.2d 682 (1st Cir. 1962).

928

himself, without restriction as to the estate or interest appointed. It is special, or limited, if its exercise is restricted to particular persons, or a particular class of persons, or if it can be exercised for only certain named purposes or under certain conditions. *Lidston's Estate,* 32 Wash.2d 408, 420, 202 P.2d 259, 266 (1949).

If the Second Preamble conveys a power, rather than describes intentions, it is a power to manage the corporation as a fiduciary and to make grants for named purposes. It is not enough to say that the trustees might decide that gifts to themselves would benefit the corporation or further a religious purpose; they must be free to ignore the benefit and the purpose. With a special power, they are simply trustees. As the Regulations firmly say, "a trustee is not an adverse party merely because of his interest as a trustee." Treas.Reg. § 1.672(a)–1(a).

■ House is also an employee of Kwik-Lok and would, taxpayers argue, be adversely affected by his decisions as a trustee: his salary might be reduced, or the company closed and his job ended. The asserted beneficial interest derives from the Second Preamble of the trust:

the Subscribers intend that the functions of this Trust shall therefore be to manage and operate as effectively as possible all properties with which the Trustees may from time to time be vested so as to maximize the economic potential thereof for the good of all and to provide employment at the economic level required by the standard of living of this culture . . . for all employees engaged in the operation of such properties.

Although we have little doubt that a right to employment can be a substantial beneficial interest, we do not find in these vague directions to the trustees any legally enforceable right. This language does not make Jerre Paxton, or any other employee of Kwik-Lok, a beneficiary of the trust. The Tax Court correctly found that Lorne House was not an adverse party.

Affirmed.

ALFRED T. GOODWIN, Circuit Judge, dissenting:

I agree with the majority that the 3.84 percentage interest Jerre Paxton now holds is modest enough to be "insignificant". We should not, however, ignore the actuarial probabilities that children will outlive their parents. If Jerre should outlive his parents, his interest is likely to jump to 28.19 per cent. In the reasonable expectation that he will eventually come into nearly a third of the estate, young Paxton might well assume a conservationist role as trustee. A holding action is in his long-range best interest. Accordingly, I would agree with the taxpayer that Jerre's interest is adverse. If this conclusion is one that Congress finds counterproductive in terms of the revenue, then it is up to Congress to plug the loophole.

I would reverse.