ALVIN E. MILLER and BERNEICE M. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket Nos. 3043-84, 6775-84.
United States Tax Court
T.C. Memo 1986-278; 1986 Tax Ct. Memo LEXIS 327; 51 T.C.M. (CCH) 1378; T.C.M. (RIA) 86278; July 7, 1986. Keith H. Gill, for the petitioners. Ross W. Paulson, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In separate statutory notices of deficiency, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Docket No.
Year
Deficiency
[1] Sec. 6651(a)(1) Sec. 6653(a)
6775-84
1977
$23,474
$1,174.00
1978
19,819
991.00
1979
28,874
3,063
1,581.00
3043-84
1980
190,677
9,533.85
1981
253,577
12,678.85
After concessions, the issues for decision are (1) whether the income from an auto product distributor business is taxable to petitioners or to the Alvin E. Miller Equity Trust; (2) whether petitioners are liable for *330 additions to tax under section 6653(a); (3) whether petitioners are liable for an addition to tax under section 6651 for the year 1979; and (4) whether damages should be awarded to the United States under section 6673. FINDINGS OF FACT Petitioners were residents of Canoga Park, California, at the time they filed their petitions herein. They timely filed 1977, 1978, 1980, and 1981 Federal income tax returns with the Internal Revenue Service Center at Fresno, California. Their 1979 Federal income tax return was filed on June 18, 1980. Petitioners did not obtain an extension of time to file and had no reasonable cause for late filing of their 1979 return. In or about 1950, petitioner Alvin Miller (petitioner) began employment as a fireman for the Los Angeles City Fire Department. In 1954, petitioners started a part-time business of selling auto care and maintenance products out of their home, with sales primarily to auto dealerships. The business was known as "Martin Distributors." In November 1975, petitioner retired from *331 the Fire Department and began working full-time with Martin Distributors. Petitioner also attended Loyola Law School in Los Angeles for 1 year. During 1976, petitioner purchased a preprinted package of trust documents from an organization known as the Institute of Religious Studies. On or about June 1, 1976, petitioner executed documents creating the Alvin E. Miller Equity Trust (the Trust). He executed a Declaration of Trust of This Equity Trust, consisting of nine pages of trust provisions and an acknowledgement page. The principal place of business of the Trust was designated a post office box in Woodland Hills, California. The declaration stated that "[t]rustees shall be not less than two in number, but may be increased for practical reasons beneficial to The Trust." The document further provided that At any regular or special meeting, a MAJORITY of the Trustees shall constitute a quorum for conducting business, PROVIDED, affirmative action may only be had upon a MAJORITY vote of the Trustees, whether present or absent, except that at special meetings called for a special purpose the MAJORITY present may affirmatively act in emergency matters." Three pages of the *332 document entitled "Trustees' Declaration of Purpose" set forth various religious beliefs of the trustor, petitioner, including the following principle: I subscribe to the statement of Federal District Court [sic] Judge LEARNED HAND in Halvering vs Gregor [sic], 69 Federal (2nd) 809, wherein he said: Anyone may so arrange his affairs that his taxes shall be as low as possible; He is not bound to choose that pattern which best pays the Treasury; There is not even a patriotic duty to increase one's taxes. Over and over again courts have said that there is nothing sinister in so arranging affairs as to keep taxes as low as possible; everyone does it, rich and poor alike, and all do right; for nobody owes any public duty to pay more than the law demands. Taxes are an enforceable exaction, and not a voluntary contribution. [Misquotation and other errors in Trust declaration; language after the words "one's taxes" does not appear in Helvering v. Gregory,69 F.2d 809, 810 (Opinion of L. Hand, Circuit Judge).] The Trust document provided for beneficial interests, to be represented by certificates entitling "the holder thereof to a pro rata *333 share of any distribution of income distributed by the Trustees in their sole discretion, and to a pro rata share of the Trust corpus upon the termination of the Trust." As for the life of the Trust, the document provided: This Trust shall continue for a period of twenty-five years from date, unless The Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason necessary to protect or conserve trust assets, liquidate the assets, distribute and close The Trust at any earlier date determined by them. The Trust shall be proportionately and in a pro rata manner distributed to the beneficiaries. * * * The Trust was acknowledged by petitioner as trustor-creator, Berneice Monna Miller (Mrs. Miller) as a trustee, and Evelyn M. Fons (Fons), as a trustee. Fons was a personal friend of petitioners. The document was recorded in the County of Los Angeles on July 21, 1976. According to Minutes of the First Meeting of the trustees of the Trust, on June 1, 1976: 5. * * * THE TRUSTEES of THIS TRUST received Alvin E. Miller's offer of certain of his real and *334 personal properties listed below in accordance with applicable law and the Declaration of TRUST, for and in exchange for One Hundred (100) Units of Beneficial Interest being ALL of the Beneficial Interest of THIS TRUST; the lifetime services of Alvin E. Miller and Berneice Monna Miller and all the currently earned renumeration accruing therefrom. The Trust and petitioner entered into an "Agreement of Services Contracts between Martin Distributors, the Alvin E. Miller Equity Trust and Alvin E. Miller," by which Martin Distributors agreed to pay 90 percent of its profits to the Trust and 10 percent to petitioner as compensation for services rendered. That Agreement further stated: "All receipts from Martin Distributors are held in joint tenancy with the Alvin E. Miller Equity Trust." According to this Agreement, "Martin Distributors is also known as the Alvin E. Miller Equity Trust" and "Martin Distributors was conveyed to the Alvin E. Miller Equity Trust on June 1, 1976." The Minutes of the Second Meeting of the trustees, dated June 2, 1976, reflect: 24. That, in the best interests of THIS TRUST, The Trustees hereby nominate, unanimously elect and appoint Alvin E. Miller *335 as THE EXECUTIVE TRUSTEE OF THIS TRUST because of his business acumen in acquiring the assets he conveyed to THIS TRUST. That, in the best interests of THIS TRUST The Trustees hereby nominate, unanimously elect and appoint Berneice Monna Miller as EXECUTIVE SECRETARY OF THIS TRUST because of her knowledge and proximity to the day to day operation of THIS TRUST. * * * ARTICLE I THE DUTIES OF THE EXECUTIVE TRUSTEES SHALL BE TO: A. Manage the day to day business affairs of THIS TRUST to the best of their management ability being guided by The Trustees and the Minutes of THIS TRUST. Keep the accounts, pay the bills accruing and collect all moneys due The Trust, depositing same to the account of THIS TRUST. B. Provide for all contingencies as required by The Trustees. C. Reside in the Trust headquarters in order to best conserve and maintain the Trust's assets and supply the Trust with gardening maintenance, janitorial, and security services for the Trust headquarters. They may contract for competent assistance as needed. Attached to those minutes was a document by which petitioners purported to assign to the Trust "[t]he right to manage, use, control or profit *336 from" their services. On June 2, 1976, petitioners executed: (1) A quit claim deed by which certain real property in Hidden Hills, California, was conveyed to the Trust; (2) A bill of sale by which other real and personal property was conveyed to the Trust, including "the exclusive use of the lifetime services of BERNEICE MONNA MILLER and all the currently earned remuneration accruing therefrom"; and personal property including savings accounts, furniture (described in great detail) and other personal property specified down to toothbrushes, towels, and Christmas decorations; and the Hidden Hills real property that was used by petitioners as their residence. On June 2, 1976, Certificates of Beneficial Interest in the Trust were executed in a series of transactions. Petitioner was initially allocated 100 units of beneficial interest but immediately redistributed them. As a result of the transactions, petitioners held 46 units, their children held 39 units, and Fons held 15 units. On or about June 30, 1976, Edward L. Vance (Vance), who was married to Mrs. Miller's mother, was elected as an additional trustee of the Trust. Fifteen units of beneficial interest were transferred *337 from Mrs. Miller to Vance.Thereafter, petitioners, Vance, and Fons commenced acting as trustees. Various permits and notices were filed with State and local agencies in the name of the Trust doing business as Martin Distributors, and bank accounts were opened in the same manner. Petitioners were signatories on the banks accounts. Petitioners' automobiles and trucks were leased to the Trust for $1 per year per vehicle. None of the executed documents reflected specific transfer of inventory, accounts receivable, or other assets of Martin Distributors to the Trust. In January 1979, Vance resigned as trustee. Fifteen units of beneficial interest were surrendered by Vance and issued to Clyde S. Pinebird (Pinebird). Vance received no payment for his interest. Pinebird was a tax return preparer who sold trust packages. Pinebird thereafter prepared income tax returns for petitioners and for the Trust. In March 1980, the Internal Revenue Service commenced an audit of petitioners' tax returns. Minutes of the Trust dated July 12, 1980, reflect the following: At this 8th meeting of the Trustees of this Trust held at the office the Trust, a Majority of the Trustees begin present, *338 by unanimous accord the following was affirmed and ratified, viz: Minute No. 40. The trustees of THIS TRUST have agreed to retain Jack Closson, ex-IRS Agent, as consultant to assist trustees in the IRS audit. On or about December 10, 1980, the trustees of the Trust executed a 16-page document entitled "Amendment to Trust." Pertinent provisions of that Amendment included the following: Alvin E. Miller grantor and Berneice Monna Miller, Trustee; Evelyn M. Fons, Trustee; Clyde S. Pinebird, Trustee; and Alvin E. Miller, Trustee do hereby declare and announce that they intend to amend the Alvin E. Miller Equity Trust. Wherever there is conflict between the original Trust Indenture and This Amendment, this Amendment shall prevail. * * * IRREVOCABILITY This trust is declared to be irrevocable and cannot be changed in any manner by the trustor. The trustor does not reserve or retain any dominion or control over the trust, or over the principal or income of the trust, nor any power to control the trust, to change beneficiaries, to remove or appoint other trustees, to exercise administrative powers over the trust or its property, or to revoke, modify, terminate, or *339 change in any manner this trust instrument, or to exercise any other significant power with respect to this trust after its creation that will specifically set forth to be exercisable by the trustor within this trust instrument. The trustor has no possessory interest in the trust, no reversionary interest, and no retained interest whatsoever nor has the trustor engaged in any secret agreements or prearrangements of any type with the trustees of this trust that obligates them to act in any manner in his behalf, except as fair, unbiased, independent fiduciaries in the best interests of the beneficiaries and in strict conformity with the guidelines and requirements of this trust instrument. * * * NUMBER OF TRUSTEES
The Board of Trustees shall consist of at least one trustee in number, but may be increased by the trustees for any practical reason they deem beneficial to the trust. * * * TRUSTEE MANAGEMENT AND CONTROL OF THE TRUST The trustees shall hold office and exercise collectively the exclusive management and control of the trust property and affairs. The property of the trust shall be held in joint tenancy. All significant actions and decisions on the part of the trust *340 shall be made by the trustees actions unanimously. DEPRECIATION DEDUCTION The trust (trustees), not the beneficiaries, shall take all deductions for the depreciation of trust property. * * * TRUSTEE OFFICERS The trustees may, in their discretion, elect from among their number executive trustees, which they may call by any designation or name, to carry out the supervision and day-to-day operation of the trust in behalf of the Board of Trustees and for the proper functioning of the trust. Any trustee may hold two or more positions in the trust simultaneously. The duties of such trustees shall be established in the Minutes of the Meetings of the Board of Trustees or shall be such duties as are ordinarily expected of such persons, subject to the overriding authority and restrictions upon such trustees are set forth in the body of this trust instrument. * * * ADVERSE PARTY Notwithstanding any other provision in this trust instrument no power shall be exercised, nor any action taken by the trustees, except upon the unanimous consent of all trustees having authority to exercise that power and only upon the approval of an adverse party. INDEPENDENT TRUSTEES
Each distribution, *341 payment of income or corpus, or any other action affecting the beneficial enjoyment of the property of this trust, shall be approved and exercised only by independent trustees, that is by trustees, not including the trustor, of whom it can be said that no more than half are related or subordinate parties who are subservient to the wishes of the trustor. The phrase "unanimous action", otherwise set forth in other portions of the trust instrument, shall mean, with respect to such decisions the unanimous action of those trustees who are allowed to take part in the use of that particular power, not the unanimous action of all possible trustees. ASCERTAINABLE STANDARDS The trustee may accumulate for or distribute to any beneficiary such portions of the income or corpus of the trust as the trustees deem necessary for the support, care, maintenance, education, medical expenses, or emergencies of the beneficiaries. No distribution from the trust shall be made except in conformity with this external ascertainable standard. * * * POWER TO TERMINATE THE TRUST This trust may be terminated only with the consent and approval of all the beneficiaries and parties having an interest in the *342 trust, vested or contingent. * * * CONTROL OF PERSONAL SERVICES No person who is a trustee of this trust shall have any authority to, nor shall he, take part in any action or decision concerning the use or control of any personal services which he formerly conveyed to the trust. All such authority, actions and decisions shall be exercised only by the other trustees. The Amendment was signed by petitioner, Mrs. Miller, Fons and Pinebird as trustees. In a section headed "CONSTRUING THE TRUST INSTRUMENT" the Amendment listed 34 different provisions of the Trust Instrument to be governed by the law of one of 23 different States or by English law, even though the Trust Instrument was executed in the State of California. [2]
*343 The Hidden Hills real property referred to in the Trust documents was petitioners' residence in 1976 and until the summer of 1977. Minutes of the Trust dated May 14, 1977, reflect the acceptance by the Trust of an offer by third parties to purchase the Hidden Hills property. Those minutes also reflect that on August 12, 1977, at the close of escrow on the Hidden Hills property, Martin Distributors would move to a new address in Canoga Park, California, which also became the residence of petitioners in 1977. On their 1977 Federal income tax return, petitioners reported and elected to defer gain on sale of the Hidden Hills residence, pursuant to section 1034. On Form 2119 attached to the return, they represented that "both the old and new properties [were] used as * * * [their] principal residence." Sale of the Hidden Hills property was never reported on any Trust return. Meetings of the trustees reflected in minutes were consecutively numbered and occurred on June 1, 1976; June 2, 1976; July 2, 1976; August 14, 1976; March 12, 1977; May 14, 1977; January 6, 1976; July 12, 1980; December 12, 1980; May 16, 1981; May 22, 1982; August 6, 1983; October 15, 1983; January 21, 1984; *344 June 8, 1984; July 7, 1984; and September 7, 1984. From 1977 through 1981, Fons lived in Utah and Kentucky. Pinebird participated in Trust decisions involving proposed loans of funds to petitioners' children for purchase of personal assets.Only petitioners, however, made day-to-day management decisions concerning the business of Martin Distributors. Income of Martin Distributors was reported on Forms 1041 for the Trust for the years in issue. Petitioner's retirement income from the Los Angeles City Fire Department was reported on petitioners' joint individual income tax returns. "Administrative deductions" were taken on the Trust returns for medical and dental expenses, utilities, and other expenses relating to petitioners' residence. Payments were made by the Trust to various of petitioners' children during 1977 and reported as distributions to beneficiaries on the Trust return for that year. In 1980, payments to petitioners' children were reported as "nonemployee compensation." Petitioners' daughter, Amanda, for example, who was born May 21, 1968, was reported to have received a distribution of $300 in 1977 and "nonemployee compensation" of $3,037.44 in 1980. Their daughter *345 Hayley, who was born November 25, 1962, was reported to have received a distribution of $1,650 in 1977 and "nonemployee compensation" of $6,760.65 in 1980. (Respondent has stipulated that the children performed services for the business.) No distributions were reported to Fons or Vance. Pinebird was paid by the Trust for his tax preparation services. In 1981, petitioners commenced operation of a business known as Certain Sales. The income from Certain Sales was reported on the Trust return for 1981. Respondent determined that income from Martin Distributors and Certain Sales (for 1981) was income taxable to petitioners rather than to the Trust. Respondent also determined that petitioners had income from sale of the business portion of the Hidden Hills residence in 1977. Respondent determined that certain, but not all, of the deductions claimed by the Trust were available to reduce petitioners' income during the years in issue. The parties have agreed that Martin Distributors had net profits of $51,071 in 1980 and $72,167 in 1981 and that Certain Sales had net profits of $4,404 in 1981. OPINION *346 Petitioners have the burden of proving that respondent's determination is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners have presented no evidence with respect to the reason for the late filing of their 1979 return, and the addition to tax under section 6651(a) must therefore be sustained. Jackson v. Commissioner,86 T.C. 492, 538 (1986). With respect to deductions originally claimed on the Trust returns but not allowed by respondent to petitioners in the staturory notice, except to the extent that such expenses have been stipulated, petitioners presented only the testimony of petitioner as to how he allocated automobile expenses claimed on the returns and the testimony of Jack Closson as to the conduct of the audit of petitioners' returns. No substantiation as required by section 274(d) was presented with respect to disallowed travel and enterclainment expenses. These items were not discussed in petitioners' opening brief or reply brief. Thus, either petitioners *347 have abandoned their contentions, or they have failed to satisfy their burden of proof as to these items. See Calcutt v. Commissioner,84 T.C. 716 (1985). The remaining dispute, therefore, is whether the business income was taxable to the petitioners or to the Trust and, if to petitioners, whether this is an appropriate case for the additions to tax for negligence or for damages under section 6673. Respondent contends that the business assets were never transferred to the Trust and that, in any event, the Trust was a grantor trust and a tax avoidance vehicle indistinguishable from those described in innumerable cases in this and other courts, e.g., Neely v. United States,775 F.2d 1092 (9th Cir. 1985); Hanson v. Commissioner,696 F.2d 1232 (9th Cir. 1983); Schulz v. Commissioner,686 F.2d 490 (7th Cir. 1982), affg. a Memorandum Opinion of this Court; Vercio v. Commissioner,73 T.C. 1246 (1980); Markosian v. Commissioner,73 T.C. 1235 (1980); Wesenberg v. Commissioner,69 T.C. 1005 (1978), and innumerable Memorandum opinions of this Court. Petitioners contend *348 that, notwithstanding the absence of specific reference to the business assets in the Trust documents, California law implements what they intended, i.e., transfer of those assets to the Trust, and that, notwithstanding the language of the Trust documents, they did not assign their income to the Trust. They claim that, notwithstanding the documentation and absence of corroborating evidence, prior to January 1, 1977, they renounced the provisions of the Trust documents dealing with assignment of income and appointment of petitioner as "Executive Trustee." They claim to have done that on the advice of an attorney by the name of Roy Ward, who was not called as a witness even though petitioner testified that Ward is still practicing law in Southern California. Petitioners contend that Evelyn Fons, Edward Vance, and Clyde Pinebird were independent trustees having an adverse beneficial interest in the Trust, and that the provisions of law dealing with grantor trusts do not, therefore, apply to this case. Neither Mrs. Miller nor Evelyn Fons testified. Petitioner represented to the Court that Mrs. Miller was ill; Mrs. Fons was out of the country; and Mr. Vance was deceased at the time *349 of trial. We were thus presented with the testimony of petitioner and Pinebird to contradict the documents and carry petitioners' burden of proof. The testimony was lacking in candor, uncorroborated, and unpersuasive. Disingenuous arguments made from prior to trial through the reply brief in an attempt to explain away documentary evidence reveal the weakness in petitioners' cause. For example, petitioners stipulated that Edward Vance was married to Mrs. Miller's mother, but they objected to respondent's proposed finding of fact that Vance was Mrs. Miller's stepfather. On cross-examination by respondent's counsel, petitioner denied that he was "Executive Trustee." When the Court pointed out the designation in the documents that he was Executive Trustee and asked for an explanation, petitioner, cautioned by his counsel to "keep it concise," indicated that petitioners rejected the provisions of the preprinted document "when we found out what the provisions were for making it stand," and asserted that he was "only manager of Martin Distributors." Petitioners ask us to believe that by December 1976 they had rejected provisions of the documents executed by them in June 1976. They *350 did not, however, do anything about changing the provisions of those documents until December 1980, after an audit of their income tax returns had commenced. As to the Amendment, in response to respondent's argument that the Amendment was so comprehensive as to negate the purported "irrevocability" of the 1976 Trust, petitioners argue in their reply brief: The record shows that the "amendment to trust" was signed by the Trustees and not by the Grantor of the Trust nor by the beneficiaries of the Trust and therefore has no legal significance under trust law. The record shows that the Trustees were intended merely to memorialize their initial agreement upon advice of counsel to conduct the Trust administration in accord with trust law rather than in compliance with the "printed trust." As set forth in the Findings of Fact, the Amendment purported to be effected by the grantor and the trustees and was signed by the four trustees, including petitioner. The so-called memorialization was 4 years after the purported advice of counsel, and a few months after the commencement of an audit by the Internal Revenue Service. Without the testimony of that counsel or any documentation *351 confirming the contents or the timing of his advice, we are unwilling to accept petitioner's testimony. We do not believe that petitioners acted in accordance with competent legal advice in forming or carrying out the Trust. Petitioners did not during the trial attempt to explain the reporting of the sale of the Hidden Hills residence on their personal income tax return for 1977 and their election on that return to take advantage of the deferral under section 1034 of gain on sale of their principal place of residence. In their reply brief, petitioners object to a finding of fact proposed by respondent by stating: The Hidden Hills real property was owned and was sold by the Trustees of the Trust. Petitioners admit that they mistakenly relied upon accountant Barbara Smith in deferring gain on the sale of the Trust real property. At trial, however, the only testimony about Barbara Smith was as follows: Q. Who is Barbara Smith? MR. GILL: I object to that, your Honor, on the grounds of relevancy. THE COURT: Well, when he answers this question we'll know if it's relevant or not. Please answer the question. THE WITNESS: Okay. Who is Barbara Smith? Barbara Smith was a *352 woman accountant that the trust engaged to act only as an accountant, she was not a trustee, she gave us no -- we never contacted her during the year, she was the woman who did the accounting procedure for the Alvin E. Miller Equity Trust in 1977. BY MR. PAULSON: Q. Did Barbara Smith sell you your trust package? A. No, sir. I didn't even know Barbara Smith. She was married to a fireman, but I never did know her. Q. Who sold you your family trust package? MR. GILL: Well, objection, your Honor. There's no evidence that anybody sold him the trust package. BY MR. PAULSON: Q. Did you purchase the documents to form your trust? A. Yes, I did, from -- Yes, I did. Q. From whom? A. From a company in Ventura. Q. Would that be known as the Institute of Religious Studies? A. Yes. Q. Is Barbara Smith the head of that institute? A. No. Q. Was she a salesperson for that institute? A. She worked in an accounting capacity for, I was led to believe, several of the people who had trusts out there. Q. Did you know if she was a salesman, or salesperson rather? A. No. I don't know. MR. GILL: Well, again, I would renew my objection, your Honor. Pinebird *353 testified that he acted as an "independent trustee." He did not identify any benefit he ever received from the "beneficial interest" he obtained when Edward Vance resigned. Pinebird identified a couple of transactions in which he refused to go along with a desire of one of petitioners' children to borrow money or purchase an automobile, and he agreed with Mrs. Miller in voting against further investment in an oil property. He participated in transactions by which the Trust borrowed money from a bank, but in that instance, he concurred with the other trustees. There was no evidence that Pinebird had anything to do with actual operation of the businesses. His testimony and petitioner's overly broad characterization of it are contradicted by the minutes showing that there were rare meetings of the trustees after Pinebird's appointment. The only reasonable conclusion from his testimony overall is that he performed services with respect to family trust packages and had no information with respect to the auto supplies business. Petitioners claim that they renounced certain (tax disadvantaged) provisions of the form Trust documents that they executed but ask that we recognized the *354 alleged independence of their nominal trustees. Such selective compliance, standing alone, suggests control by the grantor. On the entire record, we conclude that petitioners have not shown that their Trust was a viable separate taxable entity operating Martin Distributors or Certain Sales. Instead we conclude that: The answer depends on the economic realities, the substance and not merely the form, of what was done. The courts and the Congress have long recognized that trusts are easily susceptible of manipulation so as to create illusion. See, e.g., Knetsch v. United States,364 U.S. 361, 365-366 (1960); Golsen v. Commissioner,54 T.C. 742, 756 (1970), affd. 445 F.2d 985 (10th Cir. 1971); Lazarus v. Commissioner,58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975). "When the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction. Furman v. Commissioner,45 T.C. 360 (1966), *355 affd. per curiam 381 F.2d 22 (5th Cir. 1967)." Markosian v. Commissioner,73 T.C. 1235, 1241 (1980). * * * [Petitioner] purported to transfer practically all of his property and the fruits of his lifetime service to the trust, * * * [Mrs. Miller, their friend, and her stepfather] immediately made him executive trustee and conferred on him virtually unlimited control over the trust property. * * * [Petitioner] purported to transfer the family residence to the trust; however, he and * * * [Mrs. Miller] continued to occupy and use the residence in the same manner as before. When they filled out their tax returns, * * * [petitioners] through the trust deducted the otherwise nondeductible personal expenses of maintaining the home. See Schulz v. Commissioner,686 F.2d 490, 492-493 (7th Cir. 1982), affg. a Memorandum Opinion of this Court. * * * * * * Petitioners make much of the fact that the Declaration of Trust forbids the distribution of trust funds to the trustor or his spouse without the approval of an "adverse party trustee." They point out that the papers signed in * * * [June 1976] named * * * [Fons and Vance] *356 and gave * * * [each 15] of the units of beneficial interest issued by the trust. In this manner, they contend that they have avoided the application of the grantor trust provisions of sections 671 through 678 and that, in this respect, * * * [the Trust] differs from the many family trusts that have been denied tax effect. On this ground, they argue that the trust must be recognized. There are several answers to petitioner's argument. Sections 671 through 678, the grantor trust provisions, are "provisions for taxing to the grantor the income of a trust over which he has retained substantial dominion and control." S. Rept. No. 1622, 83d Cong., 2d Sess. 364 (1954); Paxton v. Commissioner,520 F.2d 923, 927 (9th Cir. 1975), affg. 57 T.C. 627 (1972); cf. Laganas v. Commissioner,281 F.2d 731, 735 (1st Cir. 1960), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court. Technical compliance with the formalities of those sections, however, does not preclude a decision, in an extreme case like this one, that there *357 is such lack of economic reality as to nullify the existence of a trust for income tax purposes.S. Rept. No. 1622, 83d Cong., 2d Sess. 365 (1954); Furman v. Commissioner,45 T.C. 360, 366 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). Such technical compliance with those sections does not breathe economic reality into an arrangement which causes no substantive change in the taxpayer's relationship to the trust property. * * * * * * [Fons, Vance, and Pinebird were trustees in name only.] Naming * * * [them] as trustee[s] was part of the facade designed to create the illusion that * * * [petitioners] relinquished control over the trust property. * * * We conclude that the trust was a transparent tax avoidance scheme, a sham, designed to reduce * * * [petitioners'] income taxes * * * by shifting part of that income to the trust and creating deductions for personal expenses. From the record before us, we find that the trust had no economic reality or effect. * * * [Fn. ref. omitted. duBois v. Commissioner,T.C. Memo. 1986-160, slip opinion pages 13-14, 16-19.] We have quoted the above language at length *358 to show that this case, indeed, is no different from the innumerable cases cited above in which so-called family trusts have been found to be mere tax avoidance devices. See Neely v. Commissioner,supra.
The distortion that petitioners, and others similarly situated, attempt is comparable to their distortion of the language from Gregory v. Helvering,293 U.S. 465 (1935), in their trust instrument quoted in the findings of fact.The truly applicable language in that case is the following: [T]he question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. The reasoning of the court below [the opinion of Judge Hand] in justification of a negative answer leaves little to be said. * * * In these circumstances, the facts speak for themselves and are susceptible of but one interpretation. The whole undertaking, * * * was in fact an elaborate and devious form of conveyance masquerading as a * * * [trust], and nothing else. The rule which excludes from consideration the motive of tax avoidance is *359 not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose. [293 U.S. at 469-470.] Although the statutory provisions in question here are those dealing with the taxation of trusts as separate entities, i.e., sections 641, et seq, the concept otherwise is totally analogous. As indicated above, we do not accept petitioner's testimony that he relied on an attorney who did not testify. We conclude that no competent lawyer could have advised petitioners that this Trust, in the manner that they operated it, would produce the desired tax advantages, and "no reasonable person would have trusted this scheme to work." See Hanson v. Commissioner,696 F.2d at 1234. Thus we sustain the additions to tax under section 6653(a). It is tempting to award damages in view of the groundless contentions of petitioners and our conclusion that the Trust was a sham. Because of the now conceded deductions and the extent of disputed facts, we do not award damages in this case. *360 See Dubois v. Commissioner,supra.
Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Although this fact initially appears to be merely a novelty, it is material in that petitioners ignore it and rely exclusively on California law in the briefs. The Amendment directs the reference to Hawaii law with respect to "declaring the trust," Maryland law with respect to "irrevocability of the trust," Illinois law with respect to personal property interest, Tennessee law with respect to "Trust purposes," Missouri law with respect to "termination of the trust," Florida law with respect to "changing the trust instrument," and sets forth other, apparently irreconcilable directions, such as application of Delaware law to "delegation of duties bby trustees," Nebraska law as to "nominee functions," and English law with respect to "hiring employees of the trust." The novelty thus becomes an absurdity and undermines the bona fides of the documentation.↩