WILLIAM E. KEEFOVER and MILDRED B. KEEFOVER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Keefover v. Commissioner
Docket No. 22751-90
United States Tax Court
T.C. Memo 1993-276; 1993 Tax Ct. Memo LEXIS 277; 65 T.C.M. (CCH) 2999; June 24, 1993, Filed *277 Decision will be entered under Rule 155 and an order denying respondent's motion under section 6673 will be issued. For petitioners: Robert L. Johnson. For respondent: Joan Steele Dennett. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to the tax as follows: Additions to Tax
Year
Deficiency
Sec.6653(a)(1)
Sec.6653(a)(2)
Sec.6661(a)
1985
$ 9,600
$ 480
*
$ 2,400
Additions to Tax
Year
Deficiency
Sec.6653(a)(1)(A)
Sec.6653(a)(1)(B)
Sec.6661(a)
1986
$ 24,667.36
$ 1,233.87
**  $ 6,169
1987
5,990.69
299.53
***  1,498
*278 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues remaining for decision are: 1. Whether petitioners' Exhibit 15 is admissible into evidence; 2. Whether the M.B. and W.E. Keefover Trust (the Main Trust) and the W.E. Keefover Surveying Trust (the Surveying Trust) should be recognized for Federal income tax purposes for the taxable years 1985, 1986, and 1987; 3. Whether any part of an underpayment of tax by petitioners was due to negligence or intentional disregard of rules or regulations within the meaning of section 6653(a)(1) and (2) for the taxable year 1985 and within the meaning of section 6653(a)(1)(A) and (B) for the taxable years 1986 and 1987; 4. Whether petitioners are liable for additions to tax for the taxable years at issue for substantial understatement of income tax pursuant to section 6661(a); 5. Whether petitioners are liable for increased interest for the taxable years at issue under section 6621(c) for substantial underpayments attributable to tax-motivated transactions; and 6. Whether, *279 under section 6673(a)(1), a penalty should be imposed against petitioners for maintaining this action primarily for delay or for maintaining a frivolous or groundless position, or whether, under section 6673(a)(2), liability for excess costs and expenses should be imposed on their counsel for multiplying the proceedings unreasonably and vexatiously. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners have previously been before this Court with respect to the taxable years 1982 and 1983. We decided essentially the same issues for those taxable years in a Memorandum Opinion, T.C. Memo. 1989-151, affd. without published opinion 923 F.2d 857 (8th Cir. 1990). In that case, we held that: 1. The Main Trust instrument did not satisfy the requirements of Nebraska State law and, therefore, failed to create a valid trust; 2. Even if valid under State law, the Main Trust would not be recognized for Federal income tax purposes because it lacked economic substance; 3. Technical *280 compliance with the formalities of the grantor trust rules does not breathe economic reality into an arrangement where none exists; and 4. Additions to tax for negligence and for substantial understatement of income tax and the increased rate of interest pursuant to section 6621(c) were warranted. However, in that case petitioners conceded the issue involving the Surveying Trust, and we did not impose a penalty under section 6673. We will not here repeat our full discussion of the facts of that case, but will focus, as necessary, on the facts previously found and any new facts brought forth in this case in order to understand and decide the issues herein raised for the taxable years 1985, 1986, and 1987. General Background
William E. Keefover (petitioner) and Mildred B. Keefover (Mrs. Keefover), husband and wife (collectively referred to as petitioners), resided in Bridgeport, Nebraska, at the time they filed their petition. Since 1948, petitioner has made his living as a surveyor. Since 1964, petitioner has been the county surveyor for Morrill County, Nebraska, and has also maintained a private surveying business. During the years at issue, Mrs. Keefover was a homemaker *281 and ran a small direct sales business. In 1980, petitioner turned 65 years old. He and Mrs. Keefover began to consider retirement and estate planning. Through friends and neighbors, petitioners came into contact with Glen B. Nelson (Nelson), who advised petitioners on the use of trusts as devices to transfer accumulated wealth and to avoid probate proceedings. Nelson is neither an accountant nor an attorney. Petitioners purchased from Nelson for $ 2,000 the instructions and forms for drafting such trusts. Petitioners did not contact an attorney or an accountant for advice concerning such trusts or for review of those documents. The Main Trust
On September 6, 1980, in the town of Bridgeport, Morrill County, Nebraska, petitioner executed a declaration of trust named "M.B. and W.E. Keefover Trust" (the Main Trust). Mrs. Keefover was appointed by petitioner to serve as the initial trustee of the Main Trust. She then appointed petitioners' adult children, Richard Keefover, Marvin Keefover, and Donna Landrigan, and their son-in-law, Robert Landrigan, as additional trustees. The two sons lived in the eastern part of Nebraska, with one working for the State of Nebraska in *282 Lincoln and the other working for an engineering firm in Omaha. Robert Landrigan lived in the area of Bridgeport where he was a farmer. The declaration of trust gave the trustees the unlimited power to hold, manage, and distribute the income and corpus of the trust, except that the distributions could not be used to discharge the trustor's (i.e., petitioner's) obligation of support. Mrs. Keefover resigned as trustee on September 20, 1980. At no time was petitioner a trustee of the Main Trust. None of the trustees of the Main Trust acting as such in 1985, 1986, and 1987 was appointed by petitioner. The stated purpose of the Main Trust was to provide for the administration of the trust assets, to prevent dissipation of wealth, to provide for loved ones, to increase the conditions of liberty and freedom to the beneficiaries of the trust and others, to promote the family concept, and to encourage and promote charities. The properties purportedly transferred to the Main Trust by petitioners included income-producing stocks and bonds, the assets (tools and equipment) of petitioner's private surveying business, petitioners' personal residence, and various household items, including *283 furniture, fixtures, linens, and many personal items. These properties constituted a substantial portion of petitioners' total assets. Petitioners continued to live in the residence and use the household items after their purported transfer to the Main Trust, and they did not pay rent for the residence. Petitioners retained title to two automobiles which they subsequently leased to the Main Trust. The formation of the trust did not substantially restrict petitioners' use of and benefit from the properties purportedly transferred to the trust, nor did it substantially alter the way petitioners lived. The Main Trust was divided into 100 units of beneficial interest. The units of beneficial interest were nonassessable, nontaxable, and nonnegotiable. The lawful owner of a unit of beneficial interest could, but was not required to, register ownership of that unit with the trust's record keeper. The unit of beneficial interest, represented by a certificate, entitled the holder to income distributions as well as a vested pro rata share of the trust corpus upon termination of the trust. Ownership of a certificate and the units represented thereby, however, did not entitle the holder *284 to any legal title in trust property. Originally, all 100 units of beneficial interest were issued to petitioner. Petitioner then transferred 50 units of beneficial interest to his wife, Mrs. Keefover. Thereafter, petitioners transferred some of their units of beneficial interest to their children and grandchildren, which resulted in the units being held as follows: UNITS
Mildred B. Keefover, petitioner
20
William E. Keefover, petitioner
5
Richard Keefover, petitioners' son
21
Marvin Keefover, petitioners' son
21
Donna Landrigan, petitioners' daughter
22
Thomas Keefover, petitioners' grandson
1
Diane Keefover, petitioners' granddaughter
1
Robert Keefover, petitioners' grandson
1
Tara Keefover, petitioners' granddaughter
1
Sondra Landrigan, petitioners' granddaughter
1
Julie Keefover, petitioners' granddaughter
1
Barbara Keefover, petitioners' granddaughter
1
Jeffrey Keefover, petitioners' grandson
1
Keegan Keefover, petitioners' grandson
1
Amber Landrigan, petitioners' granddaughter
1
James Landrigan, petitioners' grandson
1
Robert Landrigan, while a trustee, did not own any unit of beneficial interest. The bank account used by the Main Trust was in *285 the name of the trust. Petitioners, Donna Landrigan, Robert Landrigan, Richard Keefover, and Marvin Keefover all had signatory authority on that bank account. Richard and Marvin Keefover lived on the other side of the State of Nebraska, but sometimes signed their names to blank checks of the trust bank account. The checkbook and the records of the Main Trust were kept in petitioners' personal residence. Petitioners wrote checks on the Main Trust account and transferred funds from one trust account to another. Although petitioners signed only six or seven checks out of hundreds issued during the taxable years at issue, the trustees would sign blank checks and make them available to petitioners, who often used them for the payment of expenses. All decisions affecting trust management and affairs required the unanimous agreement of the trustees entitled to participate in the decisions. [1] Petitioner would attend meetings of the trustees and would offer advice. In addition, petitioner periodically would receive calls from investment advisers concerning the purchase of stocks and bonds. If he thought "it was a good thing", he would forward the information to the trustees. There *286 were few, if any, purchases of stocks and bonds by the trust in 1985, 1986, and 1987. In 1984, some of the stocks and bonds held in the Main Trust were sold in order to purchase farmland. This purchase was initiated by trustee Robert Landrigan. [2] The farmland was in close proximity to property he was farming, and this farmland was leased by the trust to him as a sharecropper. He received *287 2/3 and the Main Trust 1/3 under the sharecropping arrangement. In 1985, the Main Trust had a new home built for petitioners on a portion of the farmland purchased in 1984. Mrs. Keefover had serious health problems, including a severe case of arthritis, and this new home was designed to accommodate her reduced mobility. *288 A room in petitioners' new home served as the Main Trust's office. Petitioners' previous residence, located in downtown Bridgeport, Nebraska, was retained by the Main Trust and became rental property after petitioners moved to the new house. The trustees were authorized by the trust instrument to hire caretakers for trust properties. Robert Landrigan hired petitioners without considering anyone else for the position. Petitioners' duties as caretakers were to co-manage all of the assets of the Main Trust. These duties also included mowing the lawn of their residence, cleaning the house, and assuring that the telephone and the utility bills were paid. According to the caretakers' contract between petitioners and the Main Trust, petitioners were to be paid $ 15 per hour for the work they did. Petitioners did not pay rent for the new farm house, nor did they receive any income from the Main Trust for any services as caretakers. In 1986 and 1987, the trustees bought additional farmland for the Main Trust. The first farm purchased in 1984 was a 30-acre farm located near Robert Landrigan's personal farm. This second farm was larger, with 240 acres of irrigatable ground supplied *289 by an irrigation pivot system. This second farm was also in close proximity to Mr. Landrigan's farm, and with the irrigation system could easily be farmed by him. That land was also rented to him on a sharecrop basis. In 1985, the trustees of the Main Trust distributed $ 9,000 to Mrs. Keefover and approximately $ 700 or $ 800 to each of the trustees' families for petitioners' grandchildren. In 1986, Donna Landrigan received $ 55,000 from the Main Trust, Richard Keefover $ 10,000, and each of the trustees' families approximately $ 800 to $ 900 for the grandchildren. The Surveying Trust
The W.E. Keefover Surveying Trust (the Surveying Trust) was formed by the trustees of the Main Trust on September 22, 1980. [3] Petitioners were named the trustees of the Surveying Trust. As such, petitioners were the authorized signatories on the bank account of the Surveying Trust and maintained the checkbook and records of the Surveying Trust in their possession at their personal residence. No one else was ever considered for the position of trustee of the Surveying Trust. *290 The beneficiary of the Surveying Trust is determined by who holds the certificates for units of beneficial interest of the trust. The holder of those units, however, is not required to register the certificates with the secretary of the trustees (Mrs. Keefover). During the taxable years at issue, the Main Trust held all 100 units of beneficial interest of the Surveying Trust. The Surveying Trust, for the most part, had no assets and instead leased assets from the Main Trust, namely the surveying equipment and tools that petitioner purportedly had transferred from his private surveying business to the Main Trust. Petitioner alone physically performed the surveying work obtained by the Surveying Trust. He continued to use the same letterhead both before and after the purported transfer of his surveying business to a trust. Petitioner spent half of his time as an employee (the surveyor) of Morrill County, Nebraska, and half of his time working as a surveyor for the Surveying Trust. Petitioner claims that his work for the Surveying Trust was voluntary and that he did not receive any salary from the Surveying Trust for that work. Filing of Tax Returns
Petitioners personally *291 prepared and filed joint Federal income tax returns during each of the taxable years at issue. They also personally prepared and filed Fiduciary Income Tax Returns for the Main Trust on Forms 1041 and Corporate Income Tax Returns for the Surveying Trust on Forms 1120A. Taxes were paid on the income of the Surveying Trust as though it were a corporation. Robert Landrigan, although a trustee, did not know why corporate tax returns were filed by petitioners for the Surveying Trust. Petitioners personally prepared all of the tax returns for the Main Trust, the Surveying Trust, and their personal returns for those years. The trustees may have assisted in the preparation of the trusts' tax returns, but they did not prepare them. On their joint returns for the taxable years at issue, petitioners reported certain interest and dividends received on stocks, bonds, and Individual Retirement Accounts not transferred to the trusts. Petitioner claimed as income on petitioners' joint returns only that money received by petitioner as a result of his employment with Morrill County. [4] On Schedules C for "Keefover Direct Sales", petitioners reported gross receipts or sales of $ 1,060.08 in 1985, *292 $ 82 in 1986, and $ 4,858.52 in 1987. In addition, petitioners reported on those Schedules C other income resulting from the automobile rentals to the Main Trust and "FLP bonuses" of $ 7,207.35 in 1985, $ 10,051.53 in 1986, and $ 9,285 in 1987. After substantial deductions, mainly from the depreciation of the automobiles, petitioners reported net profits of $ 127.11 in 1985, $ 114.22 in 1986, and $ 4,718 in 1987. Fiduciary Income Tax Returns (Forms 1041) filed on behalf of the Main Trust in 1985, 1986, and 1987, reported the following types and amounts of income: 1985
1986
1987
Dividend Income
$ 24,310.66
$ 25,816.32 $ 16,145.26 Interest Income
5,161.05
4,548.85 2,417.39 Farm Income
1,129.10
(15,201.40)
(14,821.51)
Equipment and
Facilities Rent 3,000.00
3,000.00 2,400.00 Other Rent
1,243.52
2,274.83 1,820.00 Capital Gains
9,310.12
87,046.81 6,929.41 *293 Substantial deductions were claimed on the Forms 1041 in each of the taxable years at issue for mainly personal items, such as a Craftmatic adjustable bed set, a waterbed, living room furniture, a dishwasher, disposer, television set, redwood picnic table, and patio furniture. As a result, taxable income amounts were reduced to $ 13,085.19 in 1985, $ 7,357.70 in 1986, and ($ 3,608) in 1987. For the taxable years at issue, petitioner reported the income from his private surveying work, as well as certain dividends and interest, on U.S. Corporation Short-Form Income Tax Returns (Forms 1120A) filed on behalf of the Surveying Trust: 1985
1986
1987
Surveying Income
$ 11,749.10
$ 21,283
$ 23,499
Interest Income
1,826.89
2,117
2,686
Dividend Income
2,446.35
2,488
338
In the statutory notice of deficiency, dated July 13, 1990, respondent determined that the above-described items of income claimed by the Main Trust and the Surveying Trust were properly the income of petitioners. Further, respondent determined that certain deductions claimed by the trusts were nondeductible while others were deductible on petitioners' joint returns. [5]
*294 Sometime between April 6, 1989, and April 25, 1989, petitioners executed a document which was precipitated by this Court's opinion in petitioners' earlier case and which purports to remedy the defects in the Main Trust pursuant to Nebraska State law. Upon respondent's objection to the document, based on its relevance, this Court reserved ruling on its admissibility into evidence until all briefs had been filed. OPINION Admissibility of Petitioners' Exhibit 15
During trial, petitioners' counsel offered into evidence a document identified as petitioners' Exhibit 15. This document is entitled "Amendment of Trust Instrument and Ratification, or Redeclaration, of Trust as Amended" (the Amendment). The Amendment purports to retroactively correct defects in the Main Trust so as to comply with Nebraska State law. Specifically, the Supreme Court of Nebraska has held that the beneficiaries of a trust must be clearly designated or identifiable in the trust instrument. First National Bank in Ord v. Schroeder, 383 N.W.2d 755 (Neb. 1986). The original Main Trust instrument, on its face, did not adequately identify its beneficiaries. We held in our *295 previous Memorandum Opinion, T.C. Memo. 1989-151, that the trust, therefore, failed under Nebraska State law. This Amendment, specifically designating the beneficiaries of the Main Trust, was prepared after this Court's Memorandum Opinion was issued and was executed by all of the signatories in 1989. This Amendment was prepared prior to the issuance of the statutory notice of deficiency that gave rise to this case. Respondent objects to the admissibility of Exhibit 15 on the grounds of relevance. Specifically, respondent points out that the Amendment was prepared and executed in 1989, 2 years after the last year that is currently at issue before this Court. Respondent asserts that this Amendment has no bearing on the facts for the taxable years 1985, 1986, and 1987, since it was not in existence during those years. Furthermore, respondent asserts that a retroactive amendment or reformation of a contract cannot alter the Federal tax consequences of the original agreement. This Court reserved ruling upon the admissibility of Exhibit 15 until the filing of all briefs. Rule 401 of the Federal Rules of Evidence defines relevant *296 evidence: "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
This broad rule favors a finding of relevance, and only minimal logical relevancy is required, if the existence of such fact is deemed "of consequence to the determination of the action". Federal law favors the admission of probative evidence. "In fact, 'the Federal Rules and practice favor admission of evidence rather than exclusion if the proffered evidence has any probative value at all.' * * * Doubts 'must be resolved in favor of admissibility.'" United States v. Holladay, 566 F.2d 1018, 1020 (5th Cir. 1978) (quoting Sabatino v. Curtiss National Bank of Miami Springs, 415 F.2d 632, 636 (5th Cir. 1969)). During trial, this Court initially indicated that the Amendment is irrelevant to the issues before us. We reiterated the position taken in our previous Memorandum Opinion, T.C. Memo. 1989-151, that even if the trust was valid *297 under Nebraska State law, the trust may not be valid for Federal tax purposes. However, on brief, respondent herself has once again called into question the trust's validity under Nebraska State law and has asked that we hold that the trust is not valid under State law. Petitioners argue that, by the time our Memorandum Opinion in petitioners' first case was issued, the Main Trust had been engaged in a variety of transactions for 9 years and that petitioners had to do all they could to validate and protect those transactions. Thus, the Amendment was crafted to validate retroactively the Main Trust under Nebraska State law. Petitioners, hence, urge that the matter of the trust's validity under local law be resolved in their favor in this case. We decline to address the issue of whether or not the Amendment effectively and retroactively validates the Main Trust for Nebraska State law purposes. Whatever its effect for State law purposes, the Amendment cannot retroactively change the Federal tax consequences of the 1985-1987 transactions. This Court and the Court of Appeals for the Eighth Circuit have recognized the general principle that it is both inequitable and beyond *298 the power of a State Court to change retroactively the status of a federal revenue measure with a resulting loss of revenue to the government. * * *
M.T. Straight Trust v. Commissioner, 245 F.2d 327, 329 (8th Cir. 1957), affg. 24 T.C. 69 (1955). The Court of Appeals explained that, as between parties to an instrument, a reformation generally relates back to the date of the instrument, but that, as to third parties (such as the Government) who have acquired rights under the instrument, the reformation is effective only from the date thereof. Id., citing and quoting Sinopoulo v. Jones, 154 F.2d 648, 650 (10th Cir. 1946). Moreover, the validity of the trust under Nebraska State law would not be determinative of the trust's validity for Federal income tax purposes. However, this Amendment may be relevant with respect to other issues before us and should be considered in regard to respondent's motion for the imposition of a penalty or liability for excess costs under section 6673(a)(1) or (2). Although this Court has lingering doubts concerning the probative value of this document, we *299 will resolve those doubts in favor of admission. [6] Therefore, Exhibit 15 is admitted into evidence, and the persuasiveness and weight to be accorded this document will be discussed as needed below. Validity of the Main Trust
In this Court's Memorandum Opinion, T.C. Memo. 1989-151, we held that the petitioners' purported transfer of the title of assets to the Main Trust, while retaining use and enjoyment of those assets, was a sham transaction and would not be recognized for Federal income tax purposes. In the instant case, we must decide whether the facts for the taxable years 1985, 1986, and 1987 are sufficiently distinguishable *300 from those found for the taxable years 1982 and 1983 so as to breathe economic substance and reality into the trusts. Petitioners assert that the facts during 1985, 1986, and 1987 are sufficiently different from those in 1982 and 1983 to warrant a finding of economic substance and reality for the trusts at issue. First, petitioners argue that the Main Trust was effectively and retroactively validated for the taxable years in question under Nebraska law by the Amendment executed in 1989. We have already discussed this argument above and will not further address it. Second, petitioners assert that, by 1985, the administration of the trusts had evolved and was fully within the control of the trustees. They argue that the entire direction and management of the Main Trust's corpus had changed by the tax years at issue so as to have economic substance and reality. Petitioners urge us to disregard the fact that petitioners continued to be signatories on the trust's bank account and to have the ability to transfer funds from checking and savings accounts because those reasons alone should not invalidate the trust. Finally, petitioners contend that a trust that complies with the grantor *301 trust rules should not be invalidated for Federal tax purposes. Respondent argues that the initial transfer of petitioners' assets to the Main Trust did not substantially restrict petitioners' use of the property nor did it alter the manner in which petitioners continued to live. We agreed in our previous Memorandum Opinion, T.C. Memo. 1989-151, finding that the initial purported transfer to the trust was a sham and that the trust would not be recognized for Federal tax purposes for the taxable years 1982 and 1983. Respondent now argues that the continuing administration and operation of the Main Trust during the taxable years at issue did not change in any substantive manner so as to warrant a different result in the instant case. The purported establishment and operation of the Main Trust in this case has not, in fact, significantly altered any economic relationships between petitioners and their assets. Although Robert Landrigan began to exert more control over trust assets by directing specific purchases of farmland by the Main Trust, petitioners' relationship with the trust assets, especially personal items, did not *302 essentially change during the years at issue. A new house was built for petitioners to accommodate their personal needs. Furthermore, petitioners maintained control over all of the personal and much of the liquid assets purportedly transferred to the Main Trust. Petitioner attended trust meetings and was involved in the decision-making process with respect to investment of trust assets. Petitioners maintained the checkbook and trust documents in their main residence and used presigned checks to pay expenses. They served as"caretakers" of trust property without receiving pay or without paying rent for use of the house and other property. Additionally, petitioners had access to a "steady income" from trust funds through the automobile rental payments received each year and the $ 9,000 distribution to Mrs. Keefover. It has been held in similar cases that "A trust arrangement may not be used to turn a family's personal activities into trust activities, with the family expenses becoming expenses of trust administration." Neely v. United States, 775 F.2d 1092, 1094 (9th Cir. 1985) (citing Schulz v. Commissioner, 686 F.2d 490, 493 (7th Cir. 1982)). *303 In another similar case, this Court has held that: The acquisition by the Trust of a new residence for petitioners in response to a personal need * * * reflects the manner in which the Trust was used as petitioners' personal bank account. Transactions of the trust were more integrally related to the personal needs and desires of petitioners than to the business needs of the Trust.
Smith v. Commissioner, T.C. Memo. 1986-487, 52 T.C.M. 691, 693, 55 P-H Memo T.C. par. 86,487 at 2225 (1986). In such situations, this Court will look through the form of the trust arrangement and determine the tax consequences based upon the substance of the transaction. Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980); Furman v. Commissioner, 45 T.C. 360 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). Petitioners argue that the Main Trust complies with the grantor trust rules of sections 671 through 677. [7] Petitioners cite Furman v. Commissioner, supra, in which we held that compliance with the grantor *304 trust rules will not preclude a decision that there is such a lack of economic reality as to nullify an otherwise valid trust for Federal income tax purposes. Petitioners argue that the present case is not such an extreme one as to warrant a Furman-type decision.
Once again, as in petitioners' previous case, we find this argument unpersuasive. Although the trust document may have been written in a manner that technically complies with the formalities of the grantor trust rules, such an arrangement cannot be considered a valid trust for Federal income tax purposes if there is no underlying economic substance or reality. Petitioners previously argued that they had relinquished dominion and control over the trust assets and income to adverse party trustees, thus complying with the grantor trust rules. We held that, "whether the economics *305 of a trust cause a trustee or other party to be an adverse party is essentially a factual question dependent on the merits of each particular case." Keefover v. Commissioner, T.C. Memo. 1989-15157 T.C.M. 37, 42, 58 P-H Memo T.C. par. 89,151 at 729 (1989); Paxton v. Commissioner, 520 F.2d 923, 925 (9th Cir. 1975). Petitioners did not prove, in the previous case, that their children as trustees exercised dominion and control over the trust assets and income, and they again have not done so herein. The Keefover sons lived on the other side of the State of Nebraska and seem to have had little to do with the trust. Robert Landrigan was active but does not qualify as an adverse party trustee. Sec. 672(a). Therefore, we hold that, in the taxable years at issue, the Main Trust continued to be devoid of economic substance and reality and, consequently, will continue to be disregarded for Federal income tax purposes. Validity of the Surveying Trust
Petitioners argue that the Surveying Trust's creation resulted in the establishment of a valid business trust and an additional income tax burden *306 at corporate rates. Petitioners contend that the Forms 1120A filed for the Surveying Trust demonstrate strict compliance with Revenue Ruling 75-258, 1975-2 C.B. 503. [8] *307 Petitioners assert that assumption of an additional tax burden at corporate rates pursuant to the revenue ruling negates any notion of tax avoidance with respect to income that might be attributable to petitioner's personal surveying work. Further, petitioners contend that a significant share of the income reported by the Surveying Trust was derived from interest and dividends, not from petitioner's personal surveying activities, and would be taxed a second time at some point. Finally, petitioners point out that no distributions were made from the Surveying Trust to the Main Trust during the years in question and that the $ 2,100 paid as salary to petitioner in 1987 was duly reported by petitioner on his joint tax return. The record does not establish that any salary was paid to petitioner by the Surveying Trust or reported by him. [9]
Petitioners contend that the Surveying Trust is a classic business trust as defined in F.P.P. Enterprises v. United States, 830 F.2d 114 (8th Cir. 1987). [10] Petitioners also assert that the Surveying Trust is a grantor trust, the trustees of the Main Trust having created it, and the Main Trust is its only beneficiary. *308 Respondent argues that the issue is not whether the Surveying Trust should be taxed as a trust or a corporation, but whether the income reported by the Surveying Trust is taxable to petitioners or to the trust. Respondent asserts that the Surveying Trust is a sham, representing a vehicle for the assignment of income, and should be disregarded for Federal income tax purposes. Respondent disputes petitioners' assertion of compliance with Revenue Ruling 75-258 in light of Robert Landrigan's testimony that the trustees did not know why petitioners prepared and filed corporate returns for the Surveying Trust. A fundamental principle of tax law is that income is taxed to the person who earns it. Commissioner v. Culbertson, 337 U.S. 733 (1949); Lucas v. Earl, 281 U.S. 111 (1930). An impermissible assignment of income occurs when an individual who earns the income attempts to divert the income from himself to another person or entity: individuals cannot escape taxation by diverting income to some other entity through some contractual arrangement. United States v. Basye, 410 U.S. 441, 449-450 (1973). *309 Petitioners have not offered any evidence that would distinguish the Surveying Trust from the long line of cases applying that principle to family trust agreements. Gran v. Commissioner, 664 F.2d 199 (8th Cir. 1981), affg. T.C. Memo. 1980-558; Vnuk v. Commissioner, 621 F.2d 1318 (8th Cir. 1980), affg. T.C. Memo. 1979-164; Vercio v. Commissioner, 73 T.C. 1246 (1980); Wesenberg v. Commissioner, 69 T.C. 1005 (1978). An assignment of income to a trust is ineffective to shift the tax burden from the taxpayer to the trust when the taxpayer controls the earning of the income. Vnuk v. Commissioner, 621 F.2d at 1320. In this case, petitioner attempts to divert to the Surveying Trust income that he himself earned doing private surveying work. After the Surveying Trust was established, petitioner continued to use the same letterhead that he had used in his private business, retained control of the surveying equipment and tools he purportedly transferred to the Main Trust, and worked *310 for the Surveying Trust on a "voluntary" basis in the same manner as he had for his own private surveying business. In response to petitioners' argument that the Surveying Trust had income-producing capability other than petitioner's personal efforts, a review of the Forms 1120A demonstrates that the interest and dividends reported are a small portion of the total income reported, in comparison with the income earned from petitioner's surveying activities. This manner of operation leads us to conclude that, in the taxable years at issue, the Surveying Trust had no economic substance or reality and must be disregarded for Federal income tax purposes. Accordingly, all income reported by the Surveying Trust, including the payments received as a result of petitioner's private surveying work, is to be treated as his income and reportable on petitioners' joint returns. Addition to Tax for Negligence
For the taxable year 1985, section 6653(a)(1) imposes an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes a further addition in the amount of 50 percent of the interest due on that portion *311 of the underpayment attributable to the negligence or intentional disregard. For the taxable years 1986 and 1987, section 6653(a)(1)(A) and (B) impose similar additions. "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967) (Fn. ref. omitted.); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of additions to tax under section 6653(a) is presumed correct. Petitioner bears the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). As in our previous Memorandum Opinion, we again sustain respondent's determination of additions to tax for negligence. In the years at issue, petitioners did not seek professional advice concerning these trusts and effectively continued to operate the trusts in the same manner as they had in 1982 and 1983. It is appropriate to reiterate that: In our view, a prudent individual would *312 have endeavored to obtain independent legal and tax advice before attempting to make such an all-encompassing (though ineffective) disposition of all of his or her assets, including as here, the very means of livelihood. * * * Gunnarson v. Commissioner, T.C. Memo. 1982-669, 45 T.C.M. 147, 152, 51 P-H Memo T.C. par. 82,669 at 2965 (1982) (quoting Harris v. Commissioner, T.C. Memo. 1981-46). Addition to Tax for Substantial Understatement
Section 6661 provides for an addition to tax of 25 percent of the amount of the underpayment of tax attributable to a "substantial understatement of income tax". Sec. 6661(a). A substantial understatement of tax exists if the taxpayer has understated his or her tax liability by the greater of $ 5,000 or 10 percent of the tax required to be shown on the return for the taxable year at issue. Sec. 6661(b)(1)(A). The understatement, and hence the addition to tax, will be reduced if the taxpayer's treatment of an item at issue was based upon substantial authority or if the relevant facts relating to the tax treatment of that item were adequately *313 disclosed on the return or in a statement attached thereto. Sec. 6661(b)(2)(B)(i) and (ii). In order for petitioners to have presented "substantial authority" for their position, the weight of the authorities that support petitioners' position should be substantial when compared to those supporting the contrary position. H. Conf. Rept. 97-760 (1982), 1982-2 C.B. 600, 650. The regulations also provide guidance: a position that is arguable but not likely to prevail in court satisfies the reasonable basis standard but not the substantial authority standard. Sec. 1.6661-3(a)(2), Income Tax Regs.
Petitioners have neither claimed substantial authority for the position taken with respect to the tax treatment of the purported trusts nor did they disclose all relevant facts on their tax returns or on statements attached thereto. Therefore, we sustain respondent's determination of additions to tax for substantial understatement of tax. Additional Interest under Section 6621(c)
Respondent has determined that petitioners are liable for additional interest on underpayments attributable to tax-motivated transactions as defined in section 6621(c). For the *314 taxable years at issue, section 6621(c) provides that an interest rate of 120 percent of the adjusted rate established under section 6621(b) will be applied where there is a "substantial underpayment" (i.e., an underpayment of at least $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions". Sec. 6621(c)(1) and (2). Petitioners bear the burden of proving that the increased rate does not apply. Rule 142(a); Rybak v. Commissioner, 91 T.C. 524, 567 (1988). Congress amended section 6621(c) to include any sham or fraudulent transactions in the list of "tax motivated transactions". Sec. 6621(c)(3)(A)(v); Tax Reform Act of 1986, Pub. L. 99-514, sec. 1535(a), 100 Stat. 2750. A transaction that lacks economic substance is a sham transaction. Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), *315 affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). In our previous Memorandum Opinion, we found that the formations of the trusts were sham transactions, and we have found herein that the trusts continue to lack economic substance and reality. Therefore, the increased interest rate provided in section 6621(c) applies to the extent that petitioners' underpayments were attributable to such transactions. Rybak v. Commissioner, supra at 568; Patin v. Commissioner, supra.Since all of petitioners' underpayments of tax were attributable to the trusts, we hold that petitioners are liable for increased interest under section 6621(c) for taxable years 1985, 1986, and 1987. Respondent's Motion under Section 6673
Respondent has moved that a penalty be imposed upon petitioners under section 6673(a)(1) or that liability for increased costs be imposed upon petitioners' counsel under section 6673(a)(2). Section 6673(a)(1), as amended, [11] permits this Court to impose a penalty against a taxpayer, not in excess of $ 25,000, when it appears to this Court that the proceedings *316 were instituted or maintained primarily for delay, the taxpayer's position was frivolous or groundless, or the taxpayer unreasonably failed to pursue available administrative remedies. Section 6673(a)(2) permits this Court to impose liability upon counsel for excess costs, expenses, and attorneys' fees incurred because of counsel's conduct in multiplying the proceedings in any case unreasonably and vexatiously. See Harper v. Commissioner, 99 T.C. 533 (1992). A few days before the trial in this case, respondent's counsel advised petitioners and their counsel that a motion pursuant to section *317 6673 would be filed if they continued to pursue these matters in the Tax Court. After the trial, respondent's counsel moved for the imposition of a penalty under section 6673, requesting that this Court require petitioners to pay a penalty to the United States, or alternatively, their counsel personally to pay excess costs, expenses, and attorneys' fees under section 6673(a)(2)(A). Respondent contends that these proceedings were instituted primarily for delay and that petitioners' position is frivolous or groundless. Further, respondent contends that this case currently before the Court involves the same petitioners and the same trusts as were before this Court in the previously litigated case. The only differences are the taxable years at issue. Respondent concludes that petitioners, on advice of their counsel, unnecessarily are trying to relitigate issues previously decided against them and that a penalty and/or excess costs should be imposed as a result. In our previous Memorandum Opinion, T.C. Memo. 1989-151, we declined to impose a penalty upon petitioners. Upon a review of the record in this case, we again conclude *318 that a section 6673 penalty or excess costs should not be imposed upon petitioners or their counsel. Cases in which we impose a penalty usually involve petitioners who are combative, dilatory in meeting filing deadlines, or who do not appear for meetings with respondent or before this Court as ordered. See Schroeder v. Commissioner, T.C. Memo. 1990-388; Buelow v. Commissioner, T.C. Memo. 1990-219, affd. 970 F.2d 412 (7th Cir. 1992); Sampson v. Commissioner, T.C. Memo. 1988-202. Similar delaying tactics by counsel have resulted in sanctions against counsel personally. Harper v. Commissioner, supra.
There has not been a showing in this case that petitioners instituted these proceedings for purposes of delay. Petitioners and their counsel appear to have been cooperative with respondent's counsel and have provided requested documents, filed timely briefs, and appeared when required to do so. Most importantly, although basically the same issues are being relitigated herein as were litigated in petitioners' previous case, we are *319 not convinced that petitioners were asserting positions that can be deemed wholly frivolous or groundless. Petitioners honestly but erroneously believed that, by 1985, the facts had changed sufficiently to warrant a finding of a bona fide trust. In addition, petitioners thought that, by amending the trust document retroactively to comply with State law, they could further breathe economic substance and reality into the trust for Federal income tax purposes. Although these efforts did not infuse the trusts with economic substance, for the reasons explained above, we think petitioners took those steps on the advice of their counsel and were acting in good faith in pursuing this second lawsuit on the same issues. Petitioners' lack of success in this regard, however, does not mean that petitioners or their counsel pursued these positions in litigation to be uncooperative or for delay purposes. Under these circumstances, we are not inclined to impose sanctions against petitioners under section 6673(a)(1) or against their counsel under section 6673(a)(2). Therefore, we will deny respondent's motion. To reflect the above holdings, Decision will be entered under Rule 155 and an *320 order denying respondent's motion under section 6673 will be issued. Footnotes
*. 50 percent of the interest due on $ 9,600 for 1985.↩
**. 50 percent of the interest due on $ 24,667.36 for 1986.↩
***. 50 percent of the interest due on $ 5,990.69 for 1987.↩
1. Specifically, the trust instrument provided that each distribution, payment of income or corpus, or other action affecting the beneficial enjoyment of trust property must be approved and exercised only by independent trustees, i.e., trustees not including the trustor. No more than half of the independent trustees should be related or be subordinate parties who are subservient to the wishes of the trustor. Furthermore, the trust instrument defined unanimous action as the unanimous action of those trustees who are allowed to take part in the use of the particular powers, not as the unanimous action of all possible trustees.↩
2. Mr. Landrigan testified that the trustees chose to take a new direction with the trust assets by selling some of the stocks and bonds that petitioner had transferred to the Main Trust in order to purchase more tangible, rentable property. At that time, there were a number of foreclosures and bank sales in the area, and Mr. Landrigan felt that these farm properties were good investments available at bargain prices. Also Mr. Landrigan was engaged in farming, and the land purchases were of farmland close to his existing farm, which he could easily farm along with his own land. Petitioners also hoped that their sons or some of the grandchildren might return to the Bridgeport area someday to farm.↩
3. The validity of the Surveying Trust was not litigated by the parties in petitioners' previous case before this Court. In the previous case, without making any concessions as to the validity of the Surveying Trust for Federal tax purposes, petitioners conceded that the income amounts reported by the Surveying Trust in the taxable years 1982 and 1983 were properly reportable on their joint returns.↩
4. Petitioners claim that $ 2,100 of compensation was received by petitioner from the Surveying Trust in 1987 and was duly reported on petitioners' 1987 joint return. That 1987 return does not reflect that such income was received or reported.↩
5. Respondent agrees that, if the trusts are found to be valid, the deductions are allowable as claimed.↩
6. This Court is frequently inclined to treat relevancy objections as going more to the weight to be given certain evidence rather than to its admissibility. Foster v. Commissioner, 80 T.C. 34, 118-120 (1983), affd. in part and vacated in part 756 F.2d 1430↩ (9th Cir. 1985).
7. When the grantor of a trust retains any of the powers described in secs. 673 through 677, he or she is treated as being the owner of the trust for Federal income tax purposes.↩
8. In Rev. Rul. 75-258, 1975-2 C.B. 503↩, the Internal Revenue Service (the IRS) found that the family trust in question possessed a preponderance of corporate characteristics over noncorporate characteristics. Therefore, the IRS found, under sec. 7701, that the family trust was an "association" taxable as a corporation rather than a trust for Federal income tax purposes.
9. See supra↩ note 4.
10. In F.P.P. Enterprises v. United States, 830 F.2d 114, 117↩ (8th Cir. 1987), the Court of Appeals for the Eighth Circuit, affirming the District Court, determined that the trusts at issue failed as business trusts because they did not authorize the carrying on of a business for profit, the beneficial interests were not freely transferable, and the trustees did not exercise control over the property. The courts also found that the trusts lacked other essential elements, such as the identification of beneficiaries or the provision of a method for determining who the beneficiaries were intended to be.
11. Congress amended sec. 6673 in Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7731(a), 103 Stat. 2400. Congress increased the maximum penalty from $ 5,000 to $ 25,000 for positions taken after December 31, 1989, in proceedings which are pending on or commenced after such date. Congress also changed the terminology of sec. 6673(a), replacing "damages" with "penalty". Congress also added sec. 6673(a)(2) providing for counsel's liability for excess costs.↩